# NO. 12-07-00313-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *MICKEY J. HUGHES,*<br>*APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW OF* |
| *AMIE HUGHES AND IN THE*<br>*INTEREST OF D.S.H., A MINOR CHILD,*<br>*APPELLEES* | § | *CHEROKEE COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Mickey J. Hughes, appearing pro se, appeals the trial court's revised judgment in a divorce action. On appeal, Mickey presents three issues. We reverse and remand in part, modify in part, and as modified, affirm.

## BACKGROUND

Mickey and Amie Hughes were married on July 5, 1997 and are the parents of one child, D.S.H. On October 30, 2006, Mickey filed for divorce, and requested that he be appointed sole managing conservator, that he have the right to establish D.S.H.'s primary residence without regard to geographic location, that Amie be appointed possessory conservator only after a review of her mental status, and that Amie be ordered to make child support payments. He also alleged that D.S.H. had health care coverage through Medicaid. On May 22, 2007, the trial court filed a document entitled "Outline of Ruling of the Court on Final Hearing for Divorce." However, Mickey filed a motion for new trial, and the trial court granted a new trial. Further, the trial judge voluntarily recused himself from further proceedings and requested that another judge be assigned to preside.

A jury trial was held on July 23, 2007 with a different trial judge presiding. Mickey and Amie appeared pro se. The only issues at trial were determining the custody or managing conservatorship of the child, D.S.H., and whether Amie committed fraud on the community estate. At the conclusion of the evidence, the jury found that grounds existed for a divorce between Mickey and Amie, that Amie did not commit fraud on the community estate, that the transfer of monies, if any, made by Amie to third parties was fair, that Mickey and Amie should be named joint managing conservators of D.S.H., and that Mickey should have the exclusive right to designate D.S.H.'s primary residence, but restricted it to the State of Texas. On August 17, 2007, the trial court filed a judgment reflecting the jury's findings and determining the division of the marital estate. The trial court also found that no child support should be paid by either party and that Mickey should have the exclusive right to the Social Security income received by D.S.H. Further, the trial court found that D.S.H. was currently enrolled in Medicaid, and ordered Mickey to apply and pay for health care coverage for D.S.H. if Medicaid should become unavailable. The trial court ordered a visitation schedule between the parties and the child. Finally, the trial court ordered that neither party should remove the child from the State of Texas or apply for a passport for the child without prior written approval by the court.

On August 20, 2007, Mickey filed a motion for modification of the final order, alleging that the visitation schedule was unworkable, that joint managing conservatorship was contrary to the law and not in the best interest of the child, that the travel restriction outside the State of Texas was not requested by either party and violated a parent's constitutional right to travel, and that there was no valid reason for restricting his access to apply for a passport for the child. After a hearing concerning "issues which [] rendered the Original Judgment unworkable," the trial court filed a revised judgment, changing the visitation schedule to that prescribed by statute for conservators residing more than 100 miles apart. The trial court appointed Mickey as the conservator with primary possession of the child, and awarded Amie visitation and access. Further, the trial court changed the language ordering that neither party remove the child from the State of Texas without prior written approval from the court. The new language ordered that neither parent move the residence and domicile of the child from the State of Texas without prior written approval by the court. Mickey appealed pro se. Amie did not file a brief.

## JOINT MANAGING CONSERVATORS

2

In his first issue, Mickey argues that the trial court erred in appointing him and Amie joint managing conservators of D.S.H. He contends that credible evidence was presented at trial of a history or pattern of past or present child neglect by Amie, thereby preventing the trial court from appointing her joint managing conservator.

**Applicable Law**

In determining conservatorship, the best interest of the child shall be the primary consideration. TEX. FAM. CODE ANN. § 153.002 (Vernon 2008). The trial court has wide latitude in determining the best interest of a child, and the decision of the trial court will be reversed only when it appears from the record as a whole that the court has abused its discretion. *Marriage of Stein*, 153 S.W.3d 485, 488 (Tex. App.–Amarillo 2004, no pet.). It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. TEX. FAM. CODE ANN. § 153.131(b) (Vernon 2008). Evidence of child neglect determines whether a trial court may appoint the parties as joint managing conservators. *See id.* § 153.004 (Vernon 2008). If credible evidence is presented of a history or pattern of past or present child neglect by one parent directed against a child, the trial court may not appoint joint managing conservators. *Id.* § 153.004(b) (Vernon 2008).

"Neglect" of a child includes leaving a child in a situation where the child would be exposed to a substantial risk of physical or mental harm, without arranging for necessary care for the child, and the demonstration of an intent not to return by the parent. TEX. FAM. CODE ANN. § 261.001(4)(A) (Vernon 2008). It also includes placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in bodily injury or a substantial risk of immediate harm to the child. *Id.* § 261.001(4)(B)(i). Further, "neglect" includes failing to seek, obtain, or follow through with medical care for a child, with the failure resulting in or presenting a substantial risk of death, disfigurement, or bodily injury. *Id.* § 261.001(4)(B)(ii).

**Analysis**

At trial, Mickey testified that he operates the National Mediation Center (the "center"). Jonathan Hanson, a friend of Mickey's and Amie's and a volunteer program director at the center, testified that Mickey asked him to monitor D.S.H.'s safety because Mickey was concerned about his well being and welfare. Hanson believed Mickey's fears were legitimate because on one occasion,

3

Amie was supposed to pick up D.S.H.; however, D.S.H. called Hanson to pick him up hours later. According to Hanson, D.S.H. did not know what had happened to Amie because she did not call him or answer the telephone. Hanson stated that when he and D.S.H. arrived at the center, Amie was on the telephone or computer and did not seem to be interested that D.S.H. was there or in what had occurred.

On cross examination, however, Hanson admitted that D.S.H. was at his grandmother's house and that Mickey was on a business trip. Hanson stated that he has had more than one call from D.S.H. asking him for assistance. Hanson also testified that D.S.H. told him that, at times, he had to leave the center because Amie locked him out. He stated that the center is between two roads and that children are not allowed outside the building without an adult. In his opinion, Amie has not demonstrated that D.S.H. would be safe with her.

According to Mickey, Amie was so obsessed with money that she did not come home and take care of D.S.H. for two years. He stated that he told Amie that she did not need to work two jobs, but that she needed to come home, "act like a mother," and help him with the child. Mickey testified that Amie refused to help him take care of their child. He stated that Amie would drive off, leave D.S.H., and lock him out of the center, resulting in the child's having to crawl through the window in order to enter the building. Mickey testified that he saw a pouch of matches that he claimed Amie gave to D.S.H., "enough matches to cause third degree burns." He also stated that Amie gave D.S.H. her car keys and allowed him to start the car himself. He did not believe that Amie had a history of being able to take care of D.S.H.

Barbara Henzel, Mickey's mother and D.S.H.'s grandmother, testified Amie enrolled D.S.H. in a nursery school when she began nursing school. Henzel stated that the nursery school was "abominable," a fire hazard, and in terrible shape. She believed D.S.H. was sick all the time because of the school. According to Henzel, Mickey frequently traveled out of town for community service projects and that Henzel rarely kept D.S.H. less than three days and two nights a week. She testified that Mickey was D.S.H.'s primary parent.

Henzel testified that Amie worked both a daytime and a night time job. She stated that Amie was not at home, did not take care of the house, and was not with D.S.H. more than thirty minutes a day. Henzel stated that when Amie was not working, she was on the computer for hours. She testified that Amie exhibited a pattern of ignoring D.S.H.'s needs. When D.S.H. was a toddler, Amie

would come to the center about 10:00 a.m. and D.S.H. would follow her, filthy, half dressed, and with no shoes. She stated that D.S.H. would complain that he was hungry and Amie would ignore him. According to Henzel, Amie was not interested in D.S.H.

Henzel stated that when D.S.H. was seven, he left home while Amie and her mother were on the computer, walked to a gas station, and called her. Henzel stated that Amie did not know D.S.H. had left. Henzel stated that on another occasion, D.S.H. called her and told her that Amie had left him alone. According to D.S.H., Amie told him that she was calling Henzel to pick him up, but Henzel testified that Amie did not do so. One day, Henzel discovered D.S.H. sitting on her bed, listless and pale with sores all over his body. She took D.S.H. to the emergency room where he was diagnosed with an MRSA[1] infection. Henzel stated that Amie had money and should have known that the child was sick, but did not take him to a doctor. Further, Henzel stated that D.S.H. suffered a third degree burn that she "knew" was from a match. According to Henzel, Mickey told her that Amie gave D.S.H. a box of matches to play with. Referring to the incident where Hanson picked up D.S.H., Henzel stated that she was taking care of her mother and Amie had told D.S.H. that she would pick him up at 3:00 p.m. Henzel testified that by 5:00 p.m., D.S.H. called Hanson to pick him up because Amie had not called or picked him up. In Henzel's opinion, she did not believe that D.S.H. would be safe in Amie's custody.

Carla Drueckhammer, a friend who rents a house from Mickey, testified that one day D.S.H. and her son were playing when it began to get dark. Both children came to her house so that D.S.H. could use the telephone because Amie had locked the child out of the office. However, D.S.H. could not reach Amie. Drueckhammer did not believe it was appropriate for a mother to lock a child out of a building.

John Verhage, a friend of Mickey's and Amie's, testified that Amie visited his home and his former wife, Melody, frequently. He stated that Amie would drive her vehicle into the woods behind his house when she visited. He testified that when Mickey would drive by Verhage's house with the child looking for Amie, Amie and Melody would stand at the kitchen window, watch him drive by, and tell Verhage not to tell Mickey that Amie had been there. When Verhage would ask Amie where

---

[1] "MRSA" is methicillin-resistant Staphylococcus aureus, any of several bacterial strains of Staphylococcus that are resistant to beta-lactam antibiotics and that may cause severe infections. *See* http://www.meriam-webster.com/medical/MRSA.

the baby was, she would tell him that she "dumped him off with Grandma." He stated that Amie told him she was so tired from working two jobs that she did not have the energy to take care of the child. He believed that Amie knew Mickey needed help taking care of the child when she was hiding from him. In Verhage's opinion, D.S.H. would not be safe in Amie's care.

Amie testified that she worked constantly, not because she did not want to be with her child, but because Mickey was obsessed with money. She stated that D.S.H. wanted to be with her and denied refusing to take care of him. She stated that she could take care of D.S.H. and that she loved him, even though she admitted working too much. She admitted Mickey or his mother, Henzel, took care of D.S.H. because she worked. However, Amie stated that she took care of D.S.H. when she was home. She denied locking D.S.H. out of the center and denied even having a key in order to do so. According to Amie, she would lock herself in the office while D.S.H. was in the center with her mother and his friends. Amie also denied going to a friend's house to hide from Mickey so that she would not have to take care of D.S.H.

Amie testified that on a return trip from the Philippines, D.S.H. became ill. According to Amie, sores on D.S.H.'s body "popped" out when they were about to return to the United States. She stated that D.S.H. had sores on his head and body, and that when they arrived in the United States, D.S.H.'s sores were ulcerated. Amie stated that Henzel took the child to the emergency room where he was diagnosed with an MRSA infection. She also admitted that D.S.H. was seriously ill, and that according to an exhibit admitted into evidence, MRSA infections have a thirty-four percent death rate within thirty days.

The jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See* **Hinkle v. Hinkle**, 223 S.W.3d 773, 782 (Tex. App.–Dallas 2007, no pet.). Further, the jury was in a better position than an appellate court to determine what was in the best interest of the child because the jury observed the parties and witnesses, noted their demeanor, and had the opportunity to evaluate their claims. *See* **Martinez v. Molinar**, 953 S.W.2d 399, 403 (Tex. App.–El Paso 1997, no writ). Hanson and Henzel testified to one incident where Amie did not pick up D.S.H. from his grandmother's house. However, D.S.H. was with Henzel; thus, Amie had arranged for his care and there was no suggestion that she would not return. *See* TEX. FAM. CODE ANN. § 261.001(4)(A). Even though Mickey and Henzel stated that Amie refused to take care of and ignored D.S.H.'s physical needs, Amie testified that she took care of D.S.H. when she had him and

6

denied ever refusing to care for him.

Mickey, Hanson, and Drueckhammer also testified that Amie locked D.S.H. out of the center's office or, possibly, the building. Henzel testified that D.S.H. once left the center without Amie's knowledge and once left D.S.H. alone. However, Amie testified that she never locked D.S.H. out of the building, only out of the office when he was in the center with her mother and friends. Further, Mickey and Henzel stated that Amie allowed the child to play with matches, causing him to sustain burns. Henzel testified and Amie also admitted that D.S.H. was diagnosed with an MRSA infection after a trip overseas. *See id.* § 261.001(4)(B)(ii).

Even though Mickey and his witnesses testified that Amie neglected D.S.H., the jury was in a better position to evaluate their claims and believe or disbelieve them. *See Martinez*, 953 S.W.2d at 403. Where, as here, the parties and witnesses testify to different versions of the same encounter, we recognize that the jury is the sole judge of the weight and credibility of the evidence. *See Garner v. Garner*, 200 S.W.3d 303, 310 (Tex. App.–Dallas 2006, no pet.). Although we do not take claims of child neglect lightly, we cannot conclude from the record before us that the jury abused its discretion in determining that Mickey failed to rebut the presumption that both parents should be appointed joint managing conservators of D.S.H. *See id.* § 153.131(b). Accordingly, we overrule Mickey's first issue.

## CHILD SUPPORT

As part of his second issue, Mickey argues that the trial court abused its discretion by not ordering Amie to pay child support.

### Standard of Review

A court's order of child support will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *In re L.R.P.*, 98 S.W.3d 312, 313 (Tex. App.–Houston [1st Dist.] 2003, pet. dism'd). The test for abuse of discretion is whether the trial court acted without reference to any governing rules or principles. *Worford*, 801 S.W.2d at 109; *In re L.R.P.*, 98 S.W.3d at 313. In other words, the issue is whether the trial court's actions were arbitrary or unreasonable. *Worford*, 801 S.W.2d at 109; *In re L.R.P.*, 98 S.W.3d at 313.

Under the abuse of discretion standard, legal and factual insufficiency are not independent

7

reversible grounds, but are relevant components in assessing whether the trial court abused its discretion. *In re L.R.P.*, 98 S.W.3d at 313; *Farish v. Farish*, 921 S.W.2d 538, 542 (Tex. App.–Beaumont 1996, no writ). In making this determination, the reviewing court must view the evidence in the light most favorable to the actions of the trial court and indulge every legal presumption in favor of the judgment. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 578 (Tex. App.–Houston [1st Dist.] 1997, pet. denied); *In re S.B.C.*, 952 S.W.2d 15, 17-18 (Tex. App.–San Antonio 1997, no writ). If there is some evidence of a substantive and probative character to support the judgment, the trial court did not abuse its discretion. *Nordstrom*, 965 S.W.2d at 578; *In re S.B.C.*, 952 S.W.2d at 18.

**Applicable Law**

The court may order either or both parents to support a child in the manner specified by the order. TEX. FAM. CODE ANN. § 154.001 (Vernon 2008). In other words, each party has a duty to support his or her minor child. TEX. FAM. CODE ANN. § 151.001(b) (Vernon 2008); *Villasenor v. Villasenor*, 911 S.W.2d 411, 419 (Tex. App.–San Antonio 1995, no writ). Under section 154.001, a trial court must order payment of child support "once financial need and ability to pay [are] established." *Orsak v. Orsak*, 642 S.W.2d 566, 567 (Tex. App.–Dallas 1982, no writ) (citing *Grandinetti v. Grandinetti*, 600 S.W.2d 371, 372 (Tex. Civ. App.–Houston [14th Dist.] 1980, no writ)). For purposes of determining child support liability, the trial court shall calculate net resources including all wage and salary income and other compensation for personal services, interest, dividends, and royalty income, self-employment income, net rental income, and all other income actually being received. TEX. FAM. CODE ANN. § 154.062 (a), (b) (Vernon 2008). Further, there must be some evidence of a substantive and probative character of net resources in order for this duty to be discharged. *Newberry v. Bohn-Newberry*, 146 S.W.3d 233, 236 (Tex. App.–Houston [14th Dist.] 2004, no pet.). The appointment of joint managing conservators does not impair or limit the authority of the court to order a joint managing conservator to pay child support to another joint managing conservator. TEX. FAM. CODE ANN. § 153.138 (Vernon 2008).

**Analysis**

In his petition for divorce, Mickey requested that Amie be ordered to pay child support. At trial, Amie stated that she was working full time, earning $8.00 an hour, and "[t]hat's why [she has] to wait tables, hoping [she] can make money to help." It is unclear from her testimony whether Amie is

earning $8.00 an hour from one job and making extra money as a waitress, or whether she is being paid $8.00 an hour as a waitress. On cross examination, Amie testified that she did not "mind" helping Mickey with child support for D.S.H. Thus, the record contains scant evidence concerning Amie's employment, wages, salary, income, or other financial resources with which the trial court could apply the child support guidelines. *See Newberry*, 146 S.W.3d at 236. Additionally, there is little or no evidence in the record concerning Mickey's employment, wages, salary, income, or other financial resources. *See id.*

The Family Code requires a trial court to "calculate net resources" in determining a party's current child support obligations. *See* TEX. FAM. CODE ANN. § 152.062(b)*; Miles v. Peacock*, 229 S.W.3d 384, 390 (Tex. App.–Houston [1st Dist.] 2007, no pet.). Both Mickey and Amie have an obligation to support D.S.H. *See Villasenor*, 911 S.W.2d at 419. Further, the trial court had the authority to order either of the joint managing conservators to pay child support to the other. *See* TEX. FAM. CODE ANN. § 153.138. However, the trial court did not order child support. Because the trial court was required to "calculate net resources," the parents have a duty to support D.S.H., and the trial court had the authority to order a joint managing conservator to pay child support, the trial court abused its discretion in not rendering an order for child support. Accordingly, we sustain that portion of Mickey's second issue regarding child support.

## HEALTH CARE COVERAGE

As part of his second issue, Mickey contends that the trial court abused its discretion by ordering that he be responsible for D.S.H.'s health care coverage.

### Applicable Law

A trial court shall render an order for the medical support of a child in a suit affecting the parent-child relationship in which the court determines that medical support of the child must be established, modified, or clarified. TEX. FAM. CODE ANN. § 154.181(a)(2) (Vernon 2008). The court shall consider the cost and quality of health insurance coverage available to the parties and shall give priority to health insurance coverage available through the employment of one of the parties if the coverage is available at a reasonable cost. TEX. FAM. CODE ANN. § 154.182(a) (Vernon 2008). If health insurance is not available for the child through a parent's employment or membership in a union, trade association, or

other organization, but is available to a parent from another source and at a reasonable cost, the court may order that parent to provide health insurance for the child. ***Id.*** § 154.182(b)(2). However, if the court finds that neither parent has access to private health insurance at a reasonable cost, the court shall order the parent awarded the exclusive right to designate the child's primary residence to apply immediately on behalf of the child for participation in a government medical assistance program or health plan. ***Id.*** § 154.182(b-2).

**Analysis**

In the revised judgment, the trial court found that the child, D.S.H., was currently enrolled in Medicaid. The trial court ordered Mickey to apply for health coverage through C.H.I.P.S. and to pay for that coverage if Medicaid became unavailable. Mickey was further ordered to purchase a comprehensive policy of health insurance for the child at his own expense if C.H.I.P.S. became unavailable. Although Mickey stated in his brief that Amie had access to health insurance coverage, there is no evidence in the record of her access to such coverage. Mickey does not dispute that D.S.H. is covered by Medicaid. His only argument is that he cannot reasonably afford health insurance in the event that Medicaid or C.H.I.P.S. becomes unavailable.

In the absence of any evidence that Amie has access to health insurance and considering its obligation to render an order for D.S.H.'s medical support in accordance with the priorities of the Family Code, the trial court did not abuse its discretion in ordering that Mickey be responsible for obtaining health care coverage for D.S.H. in the event Medicaid and C.H.I.P.S. become unavailable. *See* Tex. Fam. Code Ann. §§ 154.181(a), 154.182(a), (b)(2), (b-2). Accordingly, we overrule the portion of Mickey's second issue regarding health care coverage.

### PASSPORT RESTRICTIONS

In his third issue, Mickey argues that the trial court abused its discretion in ordering passport restrictions. Mickey contends that restricting his right to apply for a passport for D.S.H. without prior written approval by the court was not supported by the pleadings or the evidence.

The judgment of a trial court shall conform to the pleadings of the parties. Tex. R. Civ. P. 301; ***Cunningham v. Parkdale Bank***, 660 S.W.2d 810, 812 (Tex.1983). Further, a judgment must be supported by the pleadings and, if not, it is erroneous. ***Cunningham***, 660 S.W.2d at 813. A party may not obtain a judgment based upon a theory not pleaded. ***Affiliated Capital Corp. v. Musemeche***, 804 S.W.2d 216, 219 (Tex.App.-Houston [14th Dist.] 1991, writ denied). Thus, a party may not be granted

relief in the absence of pleadings to support that relief. ***Cunningham***, 660 S.W.2d at 813; ***Holmstrom v. Lee***, 26 S.W.3d 526, 532 (Tex. App.–Austin 2000, no pet.).

Neither Mickey nor Amie requested in their pleadings that the other's right to apply for a passport for D.S.H. be restricted.[2] However, the trial court ordered that neither party have the right to apply for a passport for D.S.H. without prior written approval by the court. Because a judgment must be supported by the pleadings and neither party pleaded for such a restriction, that portion of the trial court's judgment is erroneous. *See **Cunningham***, 660 S.W.2d at 812-13; ***Holmstrom***, 26 S.W.3d at 532. Accordingly, we sustain Mickey's third issue.

## REVISED JUDGMENT

In our review of the record, we have found error. The jury in this case answered Question 4 of the jury charge as follows:

> Was the *transfer* fair, if there was a transfer, which was made by WIFE to an uncle, a cousin and her mother?"
>
> Answer "Yes" or "No."
>
> Answer: Yes[.]

Further, the trial court read the jury's verdict in open court, announcing that this question was answered in the affirmative. However, in the revised judgment, the answer to Question 4 is stated to have been "No." This court has the power and the duty to reform incorrect judgments sua sponte where it has the necessary data and information to do so. *See **Kalyanaram v. University of Texas System***, No. 03-05-00642-CV, 2009 WL 1423920, at *7 (Tex. App.–Austin May 20, 2009, no pet. h.) (mem. op.); ***Asberry v. State***, 813 S.W.2d 526, 529-30 (Tex. App.–Dallas 1991, pet. ref'd). When the record reflects a clerical variance between a judgment announced in open court and the judgment eventually signed by the trial court, the appellate court can modify the judgment to correct the mistake. ***McLendon v. McLendon***, 847 S.W.2d 601, 610 (Tex. App.–Dallas 1992, writ denied). Whether an error is clerical or judicial is a question of law. ***Id***. In this case, the trial court clearly rendered

---

[2] Further, according to section 105.002(c)(2)(C) of the Texas Family Code, the jury could not have determined Mickey's and Amie's rights to apply for a passport for D.S.H. *See* Tex. Fam. Code Ann. § 105.002(c)(2)(C) (Vernon 2008). This section provides that a court may not submit to the jury questions on the issue of any right or duty of a conservator, other than the determination of which joint managing conservator has the exclusive right to designate the primary residence of the child. *See **id**.*

judgment based on the jury's verdict in open court when the verdict was read aloud. *See **Khorshid, Inc. v. Christian***, 257 S.W.3d 748, 757 (Tex. App.–Dallas 2008, no pet.). Consequently, even though neither party raised the issue on appeal, we conclude as a matter of law that this discrepancy between the jury's verdict and the revised judgment is a clerical error and, therefore, subject to modification by this court.

<u>CONCLUSION</u>

Having sustained that portion of Mickey's second issue regarding child support, we ***reverse*** the trial court's failure to award child support and ***remand*** this issue to the trial court for proceedings consistent with this opinion. Having sustained Mickey's third issue, we ***modify*** that portion of the trial court's revised judgment restricting Mickey's and Amie's right to apply for a passport for D.S.H. without prior written approval of the court by deleting the last three paragraphs under the heading, "Permanent Mutual Injunctions." Moreover, in order to correctly reflect the jury's verdict, we ***modify*** the revised judgment, deleting the word "No," from the answer to Jury Question 4 as stated in the revised judgment, and replacing it with the word, "Yes." In all other respects, the trial court's revised judgment is ***affirmed*** as modified.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered August 19, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

12